**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**
**EX REL. JOHN RUBAR,**

                       **Plaintiffs,**

        **v.**

**THE HAYNER HOYT**
**CORPORATION et al.,**

                   **Defendants,**
        **v.**

**THE TRAVELERS**
**INDEMNITY COMPANY,**

                 **Proposed**
                 **Intervenor.**

        **5:14-cv-830**
        **(GLS/CFH)**

_____

**APPEARANCES:**                   **OF COUNSEL:**

**FOR THE PLAINTIFFS/**
**COUNTERDEFENDANTS:**
U.S. Department of Justice        ADAM J. KATZ, ESQ.
Albany Office
445 Broadway
James T. Foley Courthouse
Albany, NY 12201

Sadowski Katz LLP           RAPHAEL KATZ, ESQ.
11 Broadway, Suite 615       ROBERT W. SADOWSKI, ESQ.
New York, NY 10004

Hancock Estabrook, LLP      JOHN G. POWERS, ESQ.
1500 AXA Tower I            PAUL J. TUCK, ESQ.

100 Madison Street
Syracuse, NY 13202

**FOR THE DEFENDANTS/
COUNTERCLAIMANTS:**
*The Hayner Hoyt Corporation,
Jeremy Thurston, Gary Thurston,
LeMoyne Interiors, and Doyner, Inc.*
Greenberg Traurig, LLP          MELISSA P. PRUSOCK, ESQ.
DC Office
2101 L Street, N.W.
Washington, DC 20037

Barclay Damon LLP               JON P. DEVENDORF, ESQ.
Syracuse Office                 KAYLA A. ARIAS, ESQ.
One Park Place
300 South State Street
Syracuse, NY 13202

*Ralph Bennett and
229 Constructors, LLC*
Barclay Damon LLP               JON P. DEVENDORF, ESQ.
Syracuse Office
One Park Place
300 South State Street
Syracuse, NY 13202

**FOR THE PROPOSED
INTERVENOR:**
Barclay Damon LLP               JON P. DEVENDORF, ESQ.
Syracuse Office
One Park Place
300 South State Street
Syracuse, NY 13202

**Gary L. Sharpe**

2

**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff-relator John Rubar filed this *qui tam* action against

defendants Hayner Hoyt Corporation, Jeremy Thurston, Gary Thurston,

LeMoyne Interiors, Doyner, Inc., Ralph Bennett, and 229 Constructors,

LLC pursuant to the False Claims Act (FCA)[1].  (Compl., Dkt. No. 1.)  The

United States elected to intervene for the limited purpose of effectuating a

settlement agreement between the parties, which resolved the FCA claims

regarding defendants' fraudulent acquisition of construction contracts.

(Dkt. No. 12.)  Rubar maintains an FCA retaliation claim[2] and numerous

common law tort claims against defendants, which were not covered by the

settlement agreement.  (3d Am. Compl., Dkt. No. 95.)

Pending is defendants' motion to dismiss several of the remaining

claims, (Dkt. No. 30), Rubar's motion for attorneys' fees, costs, and

expenses, (Dkt. No. 31), and The Travelers Indemnity Company's motion

to intervene, (Dkt. No. 65).  For the following reasons, the parties' motions

---

[1] 31 U.S.C. §§ 3729-3733.

[2] 31 U.S.C. § 3730(h).

3

Case 5:14-cv-00830-GLS-CFH    Document 98    Filed 01/25/18    Page 4 of 29

are both granted in part and denied in part, and Travelers' motion is granted.

## II. <u>Background</u>

### A.    <u>Facts</u>[3]

Hayner Hoyt is a general contractor and construction management firm operated by Gary and Jeremy Thurston.  (3d Am. Compl ¶¶ 12, 15.) Doyner and LeMoyne are wholly-owned subsidiaries of Hayner Hoyt.  (*Id.* ¶¶ 13-14.)  The Thurstons used Bennett, a service-disabled veteran employed as their warehouse manager, as a figurehead to fraudulently obtain federal contracts via a sham corporation, 229 Constructors, and to funnel illicit subcontract fees into their coffers via Doyner and LeMoyne. (*Id.* ¶¶ 25-36.)

Rubar worked closely with the Thurstons as Vice President of Doyner, where he was employed for over two decades without ever receiving a negative review or complaint.  (*Id.* ¶¶ 11, 38.)  Upon discovering the fraudulent scheme, Rubar refused to participate in it or assist in its coverup; instead, he notified the government and filed this *qui tam* action.

---

[3] Unless otherwise noted, the facts are drawn from Rubar's Third Amended Complaint and presented in the light most favorable to him.

(*Id.* ¶¶ 39, 48.)

After identifying Rubar as a whistleblower, defendants threatened him with criminal prosecution based on fabricated accusations, (*id.* ¶¶ 42-43), terminated him from employment, (*id.*), eventually levied false charges against him, (*id.* ¶¶ 47-54), stalked him, (*id.* ¶ 80), defamed him to several newspapers, subcontractors, and employers, (*id.* ¶¶ 76-79, 84), maliciously interfered with his business opportunities, (*id.* ¶¶ 84-86), caused him to be terminated from subsequent employment, (*id.* ¶ 87), and attempted to physically harm him by crashing into a car that they believed he was driving, (*id.* ¶ 81).

## B.    Procedural History

Although the United States reached a settlement agreement with defendants regarding their fraudulent construction contract scheme, (Dkt. No. 12, Attach. 1), Rubar maintains a retaliation claim under 31 U.S.C. § 3730(h) and several common law tort claims, (3d Am. Compl.).[4]

_____

[4] Specifically, these torts consist of defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, abuse of process, tortious interference with contract, tortious interference with prospective business relations, false imprisonment, prima facie tort, and malicious prosecution. (3d Am. Compl. ¶¶ 118-157.) Although not specified in the complaint, the posture of both parties' briefs indicate that these torts are brought under New York State common law, (Dkt. No. 30, Attach. 1 at 5, 8-11; Dkt. No. 39 at 19-22, 24-25), and the court treats them as such.

Defendants moved to dismiss Rubar's claims of retaliation, intentional infliction of emotional distress (IIED), negligent infliction of emotional distress (NIED), tortious interference with contract and prospective business relations, and prima facie tort. (Dkt. No. 30.) Thereafter, defendants filed a partial answer[5] to Rubar's Second Amended Complaint, which included their own common law tort counterclaims against Rubar for "fraudulent, unlawful[,] and disloyal conduct undertaken by Rubar over a span of several years while he was an employee of Doyner." (Dkt. No. 53 at 25-41.)

After some confusion born by procedural impropriety, (Dkt. Nos. 55, 94), Rubar filed a Third Amended Complaint, (3d Am. Compl., Dkt. No. 95). Given defendants' contention that "the . . . Third Amended Complaint does not cure the deficiencies that have been identified in [d]efendants' motion to dismiss," (Dkt. No. 56 at 2-3), the court applies defendants' previously-filed motion to dismiss, (Dkt. No. 30), against this newly-amended complaint.

In addition to resolving the arguments presented in defendants'

---

[5] Defendants refused to answer the portion of Rubar's claims that are now at the center of their motion to dismiss. (Dkt. No. 53 at 20-22.)

6

motion to dismiss, the court must also resolve Rubar's motion for attorneys'

fees, costs, and expenses related to the settled portion of the FCA claims,

(Dkt. No. 31), as well as a subsequent motion to intervene filed by

Travelers, (Dkt. No. 65).

## III. Discussion

### A. Rule 12(b)(6) Motion to Dismiss

The standard of review under Federal Rule of Civil Procedure

12(b)(6) is well settled and will not be repeated here. For a full discussion

of the standard, the court refers the parties to its prior decision in *Ellis v.*

*Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

#### 1. Retaliation Claim

##### a. Proper Defendants

The FCA's anti-retaliation provision provides that

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop [one] or more violations of [the FCA].

31 U.S.C. § 3730(h)(1). Generally, to set forth a retaliation claim under

this section, a relator must show that "(1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017).

Rubar argues that by eliminating any reference to "employer" in a 2009 amendment to the FCA, Congress "effectively left the universe of defendants undefined and wide-open." (Dkt. No. 39 at 14-16) (quoting *Weihua Huang v. Rector & Visitors of Univ. of Va.*, 896 F. Supp. 2d 524, 548 n.16 (W.D. Va. 2012)). As such, he asserts a retaliation claim against all defendants, including the Thurstons and Bennett. (3d Am. Compl. ¶¶ 114-117.) However, defendants contend that the 2009 amendment does not allow a relator to maintain a retaliation claim against individuals as opposed to their actual employers. (Dkt. No. 42 at 2-3).

Neither side points to a Second Circuit decision resolving this relatively novel issue. However, courts in the Northern District have held that, under the post-2009 version of § 3730(h), liability may not be imposed on an individual either in an individual or official capacity. *See,*

*e.g.*, *Taylor v. N.Y. State Office for People with Developmental Disabilities*, No. 1:13–CV–740, 2014 WL 1202587, at *10 (N.D.N.Y. Mar. 24, 2014); *Monsour v. N.Y. State Office for People with Developmental Disabilities*, No. 1:13–CV–0336, 2014 WL 975604, at *10-11 (N.D.N.Y. Mar. 12, 2014).  The Southern District recently considered this issue in depth and they too joined "the overwhelming majority of courts, including the Fifth Circuit, [that] have held that the current version of § 3730(h) does not create a cause of action against supervisors sued in their individual capacities." *Diffley v. Bostwick*, 17-CV-1410, slip op. at 4 (S.D.N.Y. Dec. 6, 2017).  Therefore, in an effort to promote consistency within this district and for the reasons cited by defendants, (Dkt. No. 42 at 2-3), the court grants defendants' motion to the extent that it seeks dismissal of the FCA retaliation claims against the Thurstons and Bennett.

Next, defendants urge the court to dismiss Rubar's retaliation claim against all defendants except Doyner because, in their view, the FCA does not extend liability to a parent corporation and thus a claim can only lie against Doyner—Rubar's immediate "employer." (Dkt. No. 30, Attach. 1 at 2-5; Dkt. No. 42 at 3-4.)  Rubar argues that the court is free to pierce the corporate veil in the FCA context using the alter ego doctrine and,

alternatively, that Hayner Hoyt maintained an "employment-like" relationship with Rubar sufficient to fit within the scope of FCA liability. (Dkt. No. 39 at 16-19.)

Given the high-level of control, commonality of ownership, and close relationship between Hayner Hoyt and its subsidiaries, including Doyner, (3d Am. Compl. ¶¶ 30-32), and other reasonable inferences that can be drawn from this relationship, the court will not dismiss the retaliation claim against Hayner Hoyt at this stage.  However, Rubar does not allege facts to demonstrate that either LeMoyne or 229 Constructors maintained a similarly-situated relationship with him or level of control over him as an employee.  (*See generally id*.)  Notably, Rubar also does not object to defendants' motion in this regard.  (Dkt. No. 39 at 14-19.)  Accordingly, Rubar's retaliation claim is dismissed as against 229 Constructors and LeMoyne.  *See* N.D.N.Y. L.R. 7.1(b)(3); *Burns v. Trombly*, 624 F. Supp. 2d 185, 197 (N.D.N.Y. 2008) (finding that a party's failure to oppose a properly-filed and sound motion is consent to the relief sought).

### b.    Post-Employment Conduct

Defendants also seek dismissal of Rubar's retaliation claim against

10

them to the extent that it relates to conduct occurring *after* Rubar was terminated.  (Dkt. No. 42 at 5.)

Although allegations consisting only of post-employment conduct may not be actionable under FCA § 3730(h)(1), *see Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 306 (S.D.N.Y. 2014) *aff'd on alternative grounds*, 626 F. App'x 20, 21 (2d Cir. 2015), the court is satisfied that Rubar has sufficiently detailed conduct occurring before or at the time of his termination to state an FCA retaliation claim.  (3d Am. Compl. ¶¶ 40-43, 48.)  Therefore, this portion of defendants' motion is denied.

> 2.    IIED

Defendants also argue that the court should dismiss Rubar's common law claim for IIED because, as they posit, the complaint does not contain allegations that satisfy the high standard of "extreme and outrageous conduct," (Dkt. No. 30, Attach. 1 at 5-8), or sufficient specifics regarding the "severe emotional distress" Rubar suffered, (*id.* at 7), and the alleged conduct falls within the ambit of Rubar's defamation claim, (*id.* at 8 n.2).

Indeed, the threshold for conduct that constitutes IIED is quite

11

demanding.  *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983).  However, the court finds that Rubar's allegations demonstrate a combination of public humiliation, threatening behavior, and other actions contrary to public policy that is sufficiently "extreme and outrageous." *See, e.g.*, *Stuto v. Fleishman*, 164 F.3d 820, 828-29 (2d Cir. 1999) (collecting cases in which courts have sustained claims of IIED when a collection of similar conduct was alleged).  Additionally, Rubar has sufficiently demonstrated plausible grounds to support a finding that he suffered severe emotional distress.  (3d Am. Compl. ¶¶ 88-91.)  Lastly, even assuming that claims are barred "where the conduct complained of falls well within the ambit of other traditional tort liability," *Fischer v. Maloney*, 43 N.Y. 2d 553, 558 (1978), Rubar's IIED claim does not fit squarely within his other claims, which do not take into account the full sequence of extreme and outrageous conduct or its byproducts.

Therefore, the portion of defendants' motion pertaining to Rubar's IIED claim is denied.

### 3.   NIED

In addition to the legal elements shared with IIED, the tort of NIED is

generally "premised upon the breach of a duty owed to plaintiff which either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety."  *Dawkins v. Williams*, 413 F. Supp. 2d 161, 179 (N.D.N.Y. 2006); *see Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (explaining that a plaintiff may establish NIED under either a "bystander" or "direct duty" theory).  Rubar seeks to recover under a direct duty theory.[6]  Importantly, this duty must be specific to Rubar and not some generalized, free-floating duty to society.  *See Mortise*, 102 F.3d at 696 (citing *Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526-27(1984)).

Rubar alleges that "[d]efendants owed a special duty to [R]ubar as a whistleblower."  (3d Am. Compl. ¶ 127.)  Defendants argue that such an assertion is insufficient to allege that Bennett owed him any special duty, (Dkt. No. 30, Attach. 1 at 8-9), and that "any special duty [Rubar] alleges he was owed by his employer could not exist after the conclusion of his employment," (*id*. at 9, n.3).  Rubar tersely responds by arguing that

---

[6] Because Rubar does not allege that he was a bystander who witnessed Bennett crash into the car of a fellow employee, he can only recover if he "suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered h[is] own physical safety."  *Mortise*, 102 F.3d at 696.

Bennett owed him "the duty of refraining from attempting to physically harm him."  (Dkt. No. 39 at 24 n.10.)

First, Rubar's claim that "[d]efendants owed a special duty to R[ubar] as a whistleblower," (3d Am. Compl. ¶ 127), is a legal conclusion that the court is not bound to accept as true, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, "[t]he question of the existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal issue for the court to resolve."  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (internal quotation marks and citation omitted).

Rubar fails to adequately allege in his complaint, or argue in his responsive papers, the existence of any post-termination duty that was specifically owed to him by Doyner.  Instead, the allegations merely support the finding of "some amorphous, free-floating duty to society." *Mortise*, 102 F.3d at 696 (citing *Johnson*, 62 N.Y.2d at 526-27).  As such, to the extent that defendants had a specific duty while employing Rubar, the alleged conduct occurring at or before the time of his termination, (3d Am. Compl. ¶¶ 40-43, 48), was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to

be regarded as atrocious, and utterly intolerable in a civilized community[.]"  *Murphy*, 58 N.Y.2d at 303 (internal quotation marks and citation omitted).  For these reasons, Rubar's NIED claim is dismissed in its entirety.

### 4.    Tortious Interference with Contract

Under New York law, the elements of tortious interference with contract are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks and citation omitted).

Defendants argue that Rubar fails to allege defendants had knowledge of any contract(s) between Rubar and a third-party or that any contract was in fact breached.  (Dkt. No. 30, Attach. 1 at 10-11.)  Although defendants' knowledge may be reasonably inferred at this stage based on the surrounding allegations, Rubar indeed fails to allege that a contract was breached by a third-party.  Instead, he merely states that, as a result

of defendants' conduct, he was "forced to leave" and "lost his job at

[another company]." (3d Am. Compl ¶ 87.)  Even if the court infers that

Rubar had an employment contract with this subsequent employer and

that it terminated him, (*id.* ¶¶ 83, 87), Rubar fails to allege that this

amounted to a contractual breach.  Additionally, although Rubar alludes to

lost opportunities with subcontractors because of defendants' conduct, (*id.*

¶¶ 84-86), he does not allege the existence of any specific contracts or

whether they were breached.  Furthermore, Rubar does not respond to

this aspect of defendants' argument in his opposition.  (Dkt. No. 39 at 24-

25, 25 n.11.)  As such, Rubar's tortious interference with contract claim is

dismissed.  *See Burns*, 624 F. Supp. 2d at 197.

     *5.    Tortious Interference with Prospective Business Relations*

     Similarly, defendants seek dismissal of Rubar's tortious interference

with prospective business relations claim because "[Rubar] has failed to

allege any specific relationship with which any [d]efendant purportedly

interfered" or "that any [d]efendant had knowledge of any business

relationship that [Rubar] had with any specific third part[y.]" (Dkt. No. 30,

Attach. 1 at 11.)  However, given that the court must draw all reasonable

16

inferences in favor of the non-moving party at this stage, Rubar's

allegation that defendants interfered with his business relationship with

MCK Builders involving a masonry project, (3d Am. Compl. ¶ 86), is

enough for the court to deny defendants' motion to dismiss this claim.

      *6.    Prima Facie Tort*

      Lastly, defendants argue that Rubar fails to plead special damages

with particularity, (Dkt. No. 30, Attach. 1 at 11-12), and a claim for prima

facie tort is inapplicable where another specified tort provides a remedy,

(Dkt. No. 42 at 10).  However, these arguments fail because Rubar

sufficiently alleges that "on October 24, 2014, [d]efendant . . . informed a

client of [r]elator's employer that it would not work with any company that

had any relation to [r]elator, which resulted in the loss of several hundred

thousand dollars."  (3d Am. Compl. ¶ 85.)  This allegation alone cites lost

earnings in the amount of several hundred thousand dollars, *see, e.g.*,

*Liberman v. Gelstein*, 80 N.Y.2d 429, 434-35 (1992) (defining "special

damages" as "the loss of something having economic or pecuniary

value"), caused by defendants' otherwise lawful conduct that is not

contained within the scope of a traditional tort, *cf. Freihofer v. Hearst*

*Corp.*, 65 N.Y.2d 135, 142-43 (1985).  As such, Rubar's claim survives dismissal at this stage.

>     7.    *Settlement of Claims*

Defendants note that their motion to dismiss the FCA claims covered by the settlement agreement is premature.  (Dkt. No. 32.) Although the court takes notice of the settlement agreement regarding Rubar's first three claims, (Dkt. No. 12, Attach. 1), it will not take action on these claims until it receives written confirmation from the United States that it is in receipt of the full settlement payment,  (*id.* at 17 ¶ 12).  As such, defendants' motion to dismiss these claims, (Dkt. No. 30, Attach. 1 at 2), is denied with leave to renew.

## B.    Attorney's Fees and Costs

Since May 15, 2014, Rubar has been primarily represented by attorneys Raphael Katz[7] and Robert Sadowksi,[8] who were aided by an

---

[7] Katz is a partner with a decade of experience in all phases of *qui tam* litigation who has successfully represented relators in numerous FCA cases.  (Dkt. No. 31, Attach. 2 ¶¶ 18-19.)

[8]  Sadowski is a partner and experienced litigator of nearly three decades who previously supervised "the investigation, litigation[,] and settlement of fraud prosecutions under the [FCA]" in his role as Health Care Fraud Coordinator in the United States Attorney's Office for the Southern District of New York.  (Dkt. No. 31, Attach. 2 ¶ 19(a).)

associate, Michael DeRienzo, and support staff, Javier Santiago and Klaudia Chudzik.[9]  (Dkt. No. 31, Attach. 1 at 2; Attach. 2 ¶¶ 6, 12, 20.) Rubar's attorneys request $387,460.00 in attorneys' fees and $2,458.35 in costs and expenses for the work performed on the portion of the *qui tam* action that settled on March 11, 2016.  (Dkt. No. 31, Attach. 1 at 2; Attach. 2 at 10-23; Dkt. No. 12, Attach. 1.)  Defendants readily concede that Rubar is entitled to attorneys' fees, (Dkt. No. 37, Attach. 1 at 15), but dispute the reasonableness of Rubar's requested rates and number of hours claimed, (*id.* at 5-25).[10]

Under the FCA, a relator who brings a successful *qui tam* lawsuit is entitled to attorneys' fees.  *See United States ex rel. Keshner v. Nursing*

---

[9] Rubar notes that, although attorneys from Sadowski Fischer PLLC originally represented Rubar, "some incarnation" of Sadowski Katz LLP has been Rubar's counsel since the inception of this case.  (Dkt. No. 31, Attach. 2 ¶ 3 & n.1.)  As such, even though Rubar divides invoices by firm, pinning down exactly which firm was representing Rubar when is immaterial to the court's analysis.

[10] The only associated cost that defendants contest is the $775.00 process server fee because Rubar "never requested that [d]efendants waive service of the complaint . . . [and] did not provide the notice required by [Fed. R. Civ. P.] 4(d) before engaging in a process server to serve the complaint."  (Dkt. No. 37, Attach. 1 at 24.)  Although Rule 4(d) does allow a party to recover costs associated with service of process when an opposing party fails to waive service, Rubar seeks costs under the FCA, not pursuant to this rule.  However, for the same economical reasons underlying Rule 4(d), Rubar should have given defendants the opportunity to avoid this expense.  Therefore, the court reduces this expense by 50% to reflect both Rubar's unreasonableness and the uncertainty surrounding whether defendants would have actually agreed to such a request.  As such, Rubar is awarded $2,070.85 in costs and expenses.

*Pers. Home Care*, 794 F.3d 232, 237 (2d Cir. 2015) (citing 31 U.S.C.

§ 3730(d)(1)).  To determine a reasonable amount of attorneys' fees,

courts use the lodestar method—the product of a reasonable hourly rate

and the hours reasonably spent on the case.  *See Millea v. Metro-North*

*R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *Miller v. City of Ithaca*, No.

310-cv-597, 2017 WL 61947, at *2 (N.D.N.Y. Jan. 5, 2017).  Generally,

the district court relies on the prevailing hourly rate from the district in

which it sits in calculating the lodestar.  *See Arbor Hill Concerned Citizens*

*Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522

F.3d 182, 191 (2d Cir. 2008).  However, "a district court may use . . . some

rate in between the out-of-district rate sought and the rates charged by

local attorneys . . . in calculating the presumptively reasonable fee if it is

clear that a reasonable, paying client would have paid those higher rates."

*Id.; see Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277,

289-90 (2d Cir. 2011).  In determining what a reasonable client would be

willing to pay, the court considers several factors, including:

> the complexity and difficulty of the case, the available expertise
> and capacity of the client's other counsel (if any), the resources
> required to prosecute the case effectively (taking account of the
> resources being marshaled on the other side but not endorsing
> scorched earth tactics), the timing demands of the case, whether

> an attorney might have an interest (independent of that of his
> client) in achieving the ends of the litigation or might initiate the
> representation himself, . . . and other returns (such as reputation,
> etc.) that an attorney might expect from the representation.

*Arbor Hill*, 522 F.3d at 184.

Additionally, a district court may use a percentage deduction of the requested fees "as a practical means of trimming fat from a fee application[.]" *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) (internal quotation marks and citation omitted). In determining the appropriate fee, district courts have substantial deference and may use estimates based on their overall sense of a suit. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.").

The court agrees with defendants that it would be unreasonable to award attorneys' fees at a rate common to New York City[11]—primarily because the FCA is relatively straightforward, there are firms within this district capable of handling such matters and obtaining similar results, and

---

[11] Rubar's counsel requests $850.00 and $650.00 per hour for Sadowski and Katz, respectively. (Dkt. No. 31, Attach. 1 at 13-14; Attach. 2 ¶ 17.)

21

the FCA provides an incentive to take on a client given the prospect of receiving a percentage of any award recovered by the government.[12] However, the Northern District cases cited by defendants, (Dkt. No. 37, Attach. 1 at 16-17), are somewhat outdated and do not reflect the prevailing District rates.  Instead, Rubar's alternative request for $375.00 per hour, (Dkt. No. 31, Attach. 1 at 16), is well within the reasonable range for partners and the most experienced attorneys, and the in-District average is $280.00 per hour for less-experienced associates, and $150.00 per hour for paralegals.

Given Katz and Sadowski's specialized expertise in FCA cases, the length of time spent on the case, the amount involved in the case, and the results obtained (for both Rubar as well as the United States), an award of attorneys' fees at the higher end of the prevailing District rate is reasonable.  Therefore, a reasonable, paying client seeking attorney services would be willing to pay an hourly rate of $450.00 for Sadowski, $400.00 for Katz, $280.00 for DeRienzo, and $150.00 for support staff.

Given the degree of vagueness in the annexed invoice entries, as

---

[12] Here, for instance, Rubar will receive approximately $875,000.00 from the settled claims.  (Dkt. No. 12, Attach. 1 ¶¶ 1-2.)

highlighted by defendants, (Dkt. No. 37, Attach. 1 at 22-23), an across-the-board reduction of 10% is appropriate to accurately reflect the hours allotted to the portion of Rubar's FCA claims that settled.[13]  *See Berkshire Bank v. Tedeschi*, No. 1:11–CV–0767, 2015 WL 235848, at *5 (N.D.N.Y. Jan. 16, 2015), *aff'd*, 646 F. App'x 12 (2d Cir. 2016); *Dotson v. City of Syracuse*, No. 5:04–CV–1388, 2012 WL 4491095, at *6 (N.D.N.Y. Sept. 28, 2012).  Additionally, the court agrees with defendants, (Dkt. No. 37, Attach. 1 at 21-22), that any travel time sought to be reimbursed by Rubar's counsel is appropriately reduced by 50%.  *See Skerritt v. County of Greene*, No. 1:13–CV–663, 2015 WL 5823984, at *3 (N.D.N.Y. Oct. 6, 2015); *Clark v. Phillips*, 965 F.Supp. 331, 336 (N.D.N.Y. 1997).  As such, Rubar's requested travel time is reduced to 10.6 hours for Katz and 5.5 hours for Sadowski.  (Dkt. No. 37, Attach. 2 at 24-25.)

Accordingly, a reasonable number of hours worked are as follows:

---

[13] Defendants argue that various invoice entries should be specifically excluded because they are associated with Rubar's still-pending claims. (Dkt. No. 37, Attach. 1 at 19-20.)  However, the court finds that these entries appear to be sufficiently related to the successfully-settled claims, *see Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425, 428 (2d Cir. 1999), and, to the extent the court is unable to decide if vague entries are sufficiently related to the applicable claims, the 10% reduction provides an adequate remedy.  Furthermore, the court disagrees with defendants' contention that all time entries purportedly related to Rubar's entitlement to an award under the FCA and clerical tasks must be excluded.  (Dkt. No. 37, Attach. 1 at 20-21.)  In any event, the across-the-board reduction of 10% adequately addresses these entries as well.

93.1 hours for Sadowski (98.6 hours less the 5.5 hour travel reduction), 420.4 hours for Katz (431 hours less the 10.6 hour travel reduction), 50.0 hours for DeRienzo, 30.0 hours for Santiago, and 5.0 hours for Chudzik. (Dkt. No. 31, Attach. 2 at 8.)  As such, the total amount of attorneys' fees are $41,895.00 for Sadowski ($450.00 x 93.1), $168,160.00 for Katz ($400.00 x 420.4), $14,000.00 for DeRienzo ($280.00 x 50.0), and $5,250.00 for support staff ($150 x 35.0).  After a 10% reduction ($22,930.50), the reasonable amount of attorneys' fees awarded is $206,374.50.

Thus, the court awards Rubar $206,374.50 in attorneys' fees and $2,070.85 in costs and expenses for a grand total of $208,445.35.

## C.  <u>Motion to Intervene</u>

Defendants' counterclaims seek to recover damages arising from Rubar's fraudulent conduct while Doyner employed him.  (Dkt. No. 53 at 26-41.)  Hayner Hoyt reported these losses and accordingly Doyner recovered $246,127.22 under an indemnity agreement with Travelers. (Dkt. No. 65, Attach. 2 ¶¶ 5, 13-16.)  Travelers[14] now seeks to intervene in

---

[14] In its reply, intervenor's counsel asserts that "[t]he proposed [i]ntervenor is The Charter Oak Fire Insurance Company [(Charter Oak)], which is an affiliate of [Travelers] and

this action, pursuant to Fed. R. Civ. P. 24(a), to assert its subrogation and

reimbursement rights which are specifically provided for in the agreement.

(Dkt. No. 65, Attach. 6. at 1-2, Attach. 2 at 4.)  Rubar objects to Travelers'

motion on the grounds that it is untimely, (Dkt. No. 66 at 5-7), and the

third-party's interests are adequately represented by existing parties, (*id.*

at 7-10).

> Pursuant to Fed. R. Civ. P. 24(a)(2),
>
> [1] [o]n timely motion, the court must permit anyone to intervene
> who . . . [2] claims an interest relating to the property or
> transaction that is the subject of the action, [3] and is so situated
> that disposing of the action may as a practical matter impair or
> impede the movant's ability to protect its interest, [4] unless
> existing parties adequately represent that interest.

Despite Rubar's contention that Travelers' interest is adequately

represented by existing parties because they share the same counsel,

(Dkt. No. 66 at 7-8) (citing *Carroll v. Am. Fed'n of Musicians of U. S. &*

*Canada*, 33 F.R.D. 353, 353 (S.D.N.Y. 1963)), Travelers' has

---

an underwriting company for Travelers.  (Dkt. No. 69 at 1, n.1.)  In fact, the reply opens by
stating "Charter Oak. . . respectfully submits this [r]eply . . . in further support of *its* [m]otion to
[i]ntervene in this acton to assert *its* subrogation and reimbursement rights."  (*Id.* at 1.)
(emphases added).  To add to the confusion, the reply concludes by stating that "Travelers
respectfully requests that the [c]ourt grant *its* motion to intervene."  (*Id.* at 5.) (emphasis
added).  Given that the motion pending before the court was submitted by Travelers, (Dkt. No.
65, Attach. 6), the court refers to Travelers as the proposed intervenor, and directs counsel to
do the same.

demonstrated an unparalleled interest in recovering the amount that they

disbursed under the indemnity agreement due to Rubar's alleged conduct,

(Dkt. No. 65, Attach. 6 at 6-7).  Rubar himself admits that "[Travelers'] and

[d]efendants' interest[s] are potentially adverse."  (Dkt. No. 66 at 8.)

Furthermore, Travelers, as the insurer who has disbursed a

reimbursement, and Doyner, as the insured who collected the

reimbursement, are so situated that the ability to protect this interest may

be impaired by denying intervention.  *See N.Y. Pub. Interest Research*

*Grp., Inc. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352 (2d Cir.

1975) (finding that the *stare decisis* effect of an adverse decision should

not be ignored when deciding whether to permit intervention).  Thus, the

issue boils down to timeliness.

    A determination on timeliness resides within the court's sound

discretion and requires it to consider the following factors: "'(1) how long

the applicant had notice of the interest before it made the motion to

intervene; (2) prejudice to existing parties resulting from any delay; (3)

prejudice to the applicant if the motion is denied; and (4) any unusual

circumstances militating for or against a finding of timeliness.'"  *Ley v.*

*Novelis Corp.*, No. 5:14–cv–775, 2014 WL 3735720, at *2 (N.D.N.Y. July

29, 2014) (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir.1994)).

First, the motion to intervene was filed on January 3, 2017, within four months of the filing of counterclaims in this matter. (Dkt. No. 53; Dkt. No. 65.) As Rubar himself points out, the statute of limitations on the proposed intervenor's claim extended until at least January 23, 2017. (Dkt. No. 66 at 6.) Although the statute of limitations has now lapsed, it would be unjust to penalize proposed intervenor for a factor beyond their control, such as a court's deliberate consideration of their timely-filed motion and proposed complaint. *See U.S. for Use & Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1192 (5th Cir. 1987) ("Once the party seeking intervention has filed its motion to intervene with its proposed complaint, it has done all it can do, in a timely sense, to commence its action."); *Sec. & Exch. Comm'n v. Keller Bros. Sec. Co.*, 30 F.R.D. 532, 533-34 (D. Mass. 1962). Most importantly, the existing parties would not be prejudiced by allowing the proposed intervenor to seek an assertion of its subrogation rights in this matter as discovery is still ongoing and the conduct that is the subject of proposed intervenor's claims is already at the forefront of this litigation.

As such, Travelers' motion to intervene is granted.  Travelers is directed to file its complaint in intervention, (Dkt. No. 65, Attach. 2), on or before February 8, 2018.

## IV.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 30) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** with respect to the FCA retaliation claim (fourth claim) as against Gary Thurston, Jeremy Thurston, Ralph Bennett, LeMoyne Interiors, and 229 Constructors, LLC, the NIED claim (seventh claim) as against all defendants, and the tortious interference with contract claim (ninth claim) as against all defendants; and
>
> **DENIED** in all other respects; and it is further

**ORDERED** that defendants shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that Rubar's motion for attorneys' fees, costs, and

28

expenses (Dkt. No. 31) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** to the extent that attorneys' fees in the amount of $206,374.50 and costs and expenses in the amount of $2,070.85 are imposed against defendants; and

> **DENIED** in all other respects; and it is further

**ORDERED** that Travelers' motion to intervene (Dkt. No. 65) is **GRANTED** and Travelers shall file its pleading on or before February 8, 2018; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Hummel to schedule further proceedings in accordance with this order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

January 25, 2018
Albany, New York

Gary L. Sharpe
U.S. District Judge

29